## INDIANAPOLIS WATER CO. v. McCART et al.

No. 1403.

District Court, S. D. Indiana, Indianapolis Division.

Nov. 29, 1935.

Baker & Daniels, of Indianapolis, Ind. (William L. Ransom, of New York City, and Joseph J. Daniels and G. R. Redding, both of Indianapolis, Ind., of counsel), for plaintiff.

Philip Lutz, Jr., Atty. Gen., Urban C. Stover, First Deputy Atty. Gen., James E. Deery, Corp. Counsel, and Floyd J. Mattice, City Atty., both of Indianapolis, Ind. (Edward H. Knight, of Indianapolis, Ind., of counsel), for defendants.

BALTZELL, District Judge.

The complainant is an Indiana corporation operating as a public utility and supplying Indianapolis and its citizens with water, having so supplied them for many years. It operates under an indeterminate permit issued by the Public Service Commission, and was so operating during the year 1932.

Early in the year 1932, the Public Service Commission of Indiana (now the Public Service Commission, Acts of 1933, c. 93, p. 663), hereinafter referred to as "the commission," began an investigation of the value of complainant's property and the revenue received by it, looking toward an adjustment and revision of the rates under which it was then operating, and which were being paid by the water consumers of Indianapolis. Before a complete appraisal had been made by the commission to ascertain such value, it determined that the rates in force were too high, and that it was justified in making effective immediately a schedule of rates to be and remain in effect temporarily only, or until the appraisal, etc., could be completed and a permanent schedule adopted and made effective. This action was taken pursuant to authority given the commission to adopt emergency rates. Burns' Ann.St. 1926, § 12795. The temporary schedule was to become effective as of July 5, 1932.

The complainant was convinced that if it was compelled to operate under the temporary schedule of rates thus adopted by the commission, it would be in violation of its constitutional rights and amount to a confiscation of its property, in violation of the Fourteenth Amendment to the Constitution of the United States. Consequently, it filed in this court a bill in equity seeking to enjoin the enforcement of the order of the commission making effective the temporary schedule of rates. The bill was filed on the 1st day of July, 1932, in which bill the complainant sought and pressed its petition for an interlocutory injunction. A 3-judge court was organized, pursuant to section 266 of the Judicial Code (28 U.S.C.A. § 380), and heard such petition. The petition for an interlocutory injunction was denied, and the temporary schedule of rates became effective.

The commission continued its appraisal and investigation, with the result that a permanent schedule of rates was adopted by it on December 30, 1932, and by its order became effective as of January 1, 1933. This was an entirely different schedule from that against the enforcement of which the complainant had sought an interlocutory injunction in July. The suit, however, in which the interlocutory in-

junction had been denied, was still pending. Immediately following the entry of the order by the commission fixing the permanent schedule of rates, under date of December 30th, the complainant did, on December 31st, file what it denominated an "Amended and Supplemental Bill" in the same cause in which the interlocutory injunction had been denied. In its amended and supplemental bill complainant sought a permanent injunction against the enforcement of the permanent schedule of rates contained in the order of the commission, which was to become effective as of January 1, 1933. Such amended and supplemental bill did not seek an interlocutory injunction, but simply sought a permanent injunction against the enforcement of such order upon final hearing. Upon this state of the record, the statutory 3-judge court decided, on October 27, 1934, that this cause ceased to be one that required the functioning of such court upon the filing of the amended and supplemental bill. The jurisdiction vested in a single judge to determine the issues and decide the cause upon the filing of such amended and supplemental bill. An order to that effect was properly entered, and a memorandum opinion filed upon that date. 13 F.Supp. 107.

The defendant commission is represented in this proceeding not only by the Attorney General of the state of Indiana, but by the corporation counsel, and the city attorney of the city of Indianapolis. Burns' Ann.St. 1926, § 12674. The interest of the public is represented by the public counselor, as provided by statute (Acts of 1933, c. 93, p. 665, § 4), who was permitted by the court to appear for that purpose. An answer was filed by the commission, and, upon the issues thus joined, reference was made to Albert Ward, Esq., as special master, to hear the evidence and file herein his findings of fact and his conclusions of law, based upon such findings, for the information and guidance of the court. The properties of the complainant are extensive, and, in order that a full and complete finding may be had by this court, it was deemed advisable that such a reference be made. The time required for a hearing extended over a period of several weeks, and the record was voluminous. In so far as the necessity of a reference to a special master is concerned, the language of the Supreme Court of the United States, in the case of Chicago, Milwaukee & St. Paul Railway Company v. Tompkins, 176 U.S. 167, 20 S.Ct. 336, 341, 44 L.Ed. 417, is applicable to the instant case: "It was very laborious, and took several weeks. It was a work which really ought to have been done by a master. * * * We are all of opinion that a better practice is to refer the testimony to some competent master, to make all needed computations, and find fully the facts. It is hardly necessary to observe that in view of the difficulties and importance of such a case it is imperative that the most competent and reliable master, general or special, should be selected, for it is not a light matter to interfere with the legislation of a state in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests."

See, also, Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819.

In the instant case, the master is a person of wide experience in cases of this nature, having presided as master in many cases involving similar questions, among which is the case of Wabash Valley Electric Co. v. Singleton et al. (D.C.) 1 F.Supp. 106; Wabash Valley Electric Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447. The master went into great detail in explaining the manner in which he arrived at his conclusions as to the value of the various units and items that make up the aggregate of complainant's property. His past experience, not only as a master of this court, but as a presiding judge in a state court, qualifies him to weigh and analyze the testimony as it came from the lips of the witnesses. This does not mean that, because of his peculiar fitness for the task assigned to him, the court is relieved from the duty of reviewing the evidence and arriving at its own conclusion as to the facts in the case. It does mean, however, that great weight should be given to the report filed by him. Nevertheless, the court has the authority to hear additional evidence, and to modify or set aside such report, if, in its opinion, justice requires it. The master prepared and filed an exhaustive report of the facts, and arrived at the conclusion, and so stated the same, that the schedule of rates of which complainant com-

plains is not confiscatory of complainant's property, and that the cause should be dismissed for want of equity. Both the complainant and the defendant commission filed exceptions to this report, and the cause now comes on for hearing by the court upon the report of the master, and the exceptions filed thereto.

The commission found that the value of complainant's property used and useful, in providing water for the city of Indianapolis and its inhabitants, as of December 30, 1932, was $22,500,000. The schedule of rates of which complainant complains was intended by the commission to yield a sufficient revenue, which, in its opinion, would provide a reasonable return upon such valuation. The original verified answer of the defendant commission to the amended and supplemental bill averred, among other things, that the valuation, as found and determined by the commission, was "substantially" correct, and that the schedule of rates was sufficient to yield a reasonable return thereon. During the progress of the hearing before the master, the defendants sought to introduce evidence tending to show that the value of complainant's property was much less than that found by the commission. The complainant interposed an objection to the admissibility of this character of evidence, upon the theory that there had been a solemn judicial finding as to the value of complainant's property by the defendant commission, and that it is now estopped from introducing testimony to impeach such finding. In other words, it is the contention of the complainant that, in so far as the commission is concerned, the question of a lower value than that theretofore determined by it had been adjudicated by it and was res adjudicata as to defendants. The defendant commission then appeared before the court on June 2, 1933, and asked leave of court to amend its answer so as to make such testimony admissible, if, in fact, it was inadmissible under the answer as originally filed. The court at that time, however, denied the defendants the right to amend, but asserted that the master could hear all testimony that he deemed admissible, and that then defendants could ask leave to amend to conform to the proof, if they so desired. Consequently, after the taking of testimony had been completed, the defendants then filed in this cause a motion for leave to amend its answer so as to conform to the proof, and on October 7, 1933, such leave was granted. The answer was then amended by interlineation, and avers that the value of complainant's property, as fixed by the commission, does "not exceed" the sum of $22,500,000, instead of "substantially" that amount, as alleged in the original answer. There was evidence introduced upon the hearing before the master tending to support this theory, and the court therefore permitted the amendment to be made after the introduction of all evidence. Both the complainant and defendants, however, were given permission by the court, at the time of the amendment to the answer, to introduce any additional evidence they desired, but neither party either offered or introduced any additional testimony, but rested their case upon the evidence introduced prior to such amendment. There can be no doubt but that the court had authority to grant defendants permission to so amend. Burns' Ann.St. 1926, § 423. See, also, Equity Rule No. 19, 28 U.S.C.A. following section 723.

The question presented for determination by the court is whether or not the revenue received by complainant, and to be received by it in the future, from the schedule of rates as fixed by the defendant commission, is sufficient to constitute a fair and reasonable return upon the fair and reasonable value of complainant's property used and useful in supplying water to Indianapolis and its citizens. The value as fixed by the commission may be erroneous; yet, if the revenue derived from the schedule of rates is sufficient to constitute a fair and reasonable return upon the value, as found by the court, then the action of the commission in determining such erroneous value does not constitute confiscation, under the provisions of the Federal Constitution. Wabash Valley Electric Company v. Young et al., supra. The complainant is entitled to a fair and reasonable return upon the fair and reasonable value of its property, and that is all to which it is entitled. In a proceeding of this nature, it is the duty of the court to determine the fair and reasonable value of complainant's property (Ohio Valley Water Company v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908), and it cannot be said that this

court is not entitled to all available evidence touching the value thereof, in order that it may arrive at a just conclusion as to such value. To deprive defendants of the privilege of introducing evidence of a value different from that found by the commission upon the rate hearing would be unfair and unjust to the court, as well as to the litigants. This court, under such circumstances, would be compelled to either accept the value as fixed by the commission, or find a higher value in accordance with the testimony of some of the witnesses for complainant. Such cannot be the law. The finding of the commission is not res adjudicata as to such value in so far as to estop it from introducing evidence of a different value than that found by it at the rate hearing. Prentis v. Atlantic Coast Line Company, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 50. This court must be free to hear and weigh the testimony of all witnesses produced, whether by complainant or defendants. It has the duty and responsibility finally of determining the fair and reasonable value of complainant's property, and this it can do only by hearing and weighing all testimony relating thereto.

The hearing before the master extended over a period of many weeks, all of which time was consumed in the taking of testimony relating to the facts upon which the conclusion must be based. It is neither advisable nor necessary to state such facts in this opinion, as the master's report is on file and contains a finding of such facts in detail. In addition thereto, this court has complied with the requirements of Equity Rule No. 70½, 28 U.S.C.A. following section 723, and has filed separately its findings of fact and conclusions of law. It might be advisable, however, to observe that the complainant was incorporated in the year 1881, at which time it became the owner of, and still is the owner of, certain franchises wherein it is given the privilege of using streets, alleys, etc., for the purpose of laying and maintaining its water mains. There is a canal located within, or near, the city of Indianapolis, and the complainant acquired and possesses the right to use such canal, together with the berm, which was formerly used as a towpath, for the purpose of supplying water to its customers. The complainant has also acquired and utilized certain water rights in and along White river, a nonnavigable stream, and along Fall creek. It has many valuable pumping stations, dams, etc., along such streams, which are used in supplying water. Later, as the city of Indianapolis developed and expanded, it became apparent that the water needs of such city would be greatly increased, complainant therefore purchased many acres of land, in anticipation of its future needs. Some of this land is several miles from the city, near Noblesville, and will hereafter be spoken of as the "Noblesville tract." Complainant also purchased, and now owns, approximately 5,000 acres of land along Fall creek, near Oaklandon, which is known and spoken of as the "Oaklandon project." It was the intention of complainant, at the time it purchased this latter tract of land, to build a dam across Fall creek, near the south boundary line of such land, which would flood it and thereby make it valuable as a storage reservoir for water. Such project has never been consummated, and no effort has been made by complainant to utilize any of the land thus acquired for the purpose intended, although such land was purchased during the year 1930. Neither has the Noblesville tract been utilized by the complainant, as contemplated at the time of its purchase, nor does it in any manner contribute to the supply of water or efficiency of the water service. There is some evidence tending to discredit the good faith of complainant, in the purchase thereof, but such land was, in our opinion, purchased in good faith. Without further comment upon the property owned by complainant, which is used and useful in supplying water to its consumers, it is sufficient to say that the evidence discloses that such property constitutes a modern plant adequate to supply the needs of the city of Indianapolis and its inhabitants. A full and complete description of all property owned by it may be found in the special findings of fact filed in this cause.

The report of the special master itemizes in detail the property of complainant, and elaborates upon the testimony of the various witnesses concerning the value thereof, and finally arrives at a conclusion as to its value. Both the complainant and defendants have filed exceptions to such report. The complainant has filed 142 exceptions, and the defend-

ants have filed 17 exceptions to such report. The exceptions challenge the conclusions of the master, as to the value of complainant's property, the revenue to be derived from the schedule of rates in question, and the rate which the master finds is sufficient to afford complainant a just and reasonable return upon the value of its property as found · by him. It is the contention of the complainant that the value of its used and useful property, as found by the master, is too low; that the amount of revenue which he finds will be derived from the rates in question is erroneous, but, if correct, is insufficient to give it a fair and reasonable return upon the value of its property; and that the rate of return found by him is too small. The complainant also criticizes rather severely, in its brief, the method used by the master in arriving at his conclusion as to value, depreciation, rate of return, etc., as well as to the weight and credit given the testimony of the witnesses appearing before him. The defendants contend, and present by their exceptions, that the value of complainant's property, used and useful in supplying water to its consumers, as found by the master, is too high; that certain property included by him, in arriving at such value, should be excluded, in determining the value thereof. It, therefore, becomes the duty of the court to determine, first, the value of complainant's property, used and useful, tangible and intangible, as of April 1, 1933, and as of this date, and for a reasonable time in the future; second, the rate of return to which complainant is entitled upon the fair and reasonable value of its property; third, whether or not the schedule of rates in question will produce enough revenue to guarantee to complainant such rate of return upon the value of its property as found by the court.

The first consideration, therefore, should be as to the value of complainant's property, used and useful for the furnishing of water as of April 1, 1933, of this date, and for a reasonable time in the future. It is well to observe at this time that the value of complainant's property for rate-making purposes, as of January 1, 1924, has been heretofore litigated in this court, and in the Supreme Court of the United States. McCardle et al. v. Indianapolis Water Company, 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316. The value of complainant's property at that time was fixed by the district court at an amount of not less than $19,000,000, and affirmed by the Supreme Court. Since that time, some additions have been made to its plant, the cost of which is reflected by its books, but the value of such additions, at the time of the hearing, is not disclosed by the evidence. While the cost of such additions is relevant and should be considered by the court in determining the value thereof, yet it is not the final test, and does not necessarily fix the value. Property may be worth more or less than its actual cost. Hence, the present value in the instant case cannot be determined by an addition of the cost of the improvements, or of their value at this time, to the heretofore found value of the property. This is not only true because the cost of such improvements or additions does not reflect their value, but for the further reason that the value of complainant's property, as of January 1, 1924, does not reflect its value as of April 1, 1933, or of this date. Conditions have greatly changed since 1924; the price level has greatly decreased, as well as the rate of return required. It has been often held by the Supreme Court that, in order to determine present value, the cost of reproducing the property is a relevant fact which should have appropriate consideration. Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; McCardle et al. v. Indianapolis Water Company, supra.

In the case of Los Angeles Gas & Electric Corporation v. Railroad Commission of California et al., 289 U.S. 287, 53 S.Ct. 637, 645, 77 L.Ed. 1180, the Supreme Court, speaking through Mister Chief Justice Hughes, said: "In Southwestern Bell Telephone Co. v. Public Service Commission, supra, this court said that 'it is impossible to ascertain what will amount to a fair return upon properties devoted to public service, without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is whol-

ly disregarded, such a forecast becomes impossible.' * * * But, again, the court has not decided that the cost of reproduction furnishes an exclusive test. * * * We have emphasized the danger in resting conclusions upon estimates of a conjectural character. We said, in Minnesota Rate Cases, supra, 230 U.S. [352] 452, 33 S.Ct. 729, 761, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas. 1916A, 18: 'The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. * * *' The weight to be given to actual cost, to historical cost, and to cost of reproduction new, is to be determined in the light of the facts of the particular case."

■ A careful study of the historical cost and reproduction new, depreciated, as well as a study of the value of complainant's property in the light of price indices, showing the decline or rise in prices, is necessary in arriving at a fair value of such property. See: Clark's Ferry Bridge Company v. Public Service Commission of Pennsylvania, 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767. See, also, St. Louis & O'Fallon Railway Company et al. v. United States et al., 279 U.S. 461, 49 S.Ct. 384, 73 L.Ed. 798. The original cost of the property, plus the cost of additions, etc., which aggregate the amount of the investments, is, of course, not the proper method to use in arriving at the present value of such property. The Supreme Court, in the case of West et al. v. Chesapeake & Potomac Telephone Company of Baltimore City, 295 U.S. 662, 55 S.Ct. 894, 898, 79 L.Ed. 1640, under date of June 3d, 1935, in discussing the method to be used in arriving at the value of a public utility, for rate-making purposes, used this language: "We have therefore held that where the present value of property devoted to the public service is in excess of original cost, the utility company is not limited to a return on cost. Conversely, if the plant has depreciated in value, the public should not be bound to allow

a return measured by investment. Of course the amount of that investment is to be considered along with appraisal of the property as presently existing, in order to arrive at a fair conclusion as to present value, for actual cost, reproduction cost and all other elements affecting value are to be given their proper weight in the final conclusion."

It is also stated that: "This is not to suggest that price trends are to be disregarded; quite the contrary is true. And evidence of such trends is to be considered with all other relevant factors."

■ This case criticizes the method used by the district court, as well as by the commission, in arriving at the value of the telephone company, but affirms the district court, upon the theory that the value, as fixed by the commission, and the schedule of rates, as fixed by it, were confiscatory. Such decision did not change or alter the rule as formerly established by that court as to the method of arriving at the value of such property, but cites, with approval, the case of Los Angeles Gas & Electric Corporation v. Railroad Commission of California et al., supra. It is apparent, therefore, that the cost of reproduction new, less depreciation, is not the sole test as to the value of complainant's property upon which it must receive a fair and reasonable return. The cost of reproduction new is relevant, and is an element which must be given consideration in arriving at a fair value. The weight to be given to such evidence is, however, "to be determined in the light of the facts of the particular case."

In the instant case, the master heard the testimony as it fell from the lips of the witnesses. He had opportunity to observe each witness, and thus be guided to a certain extent in the weight to be given the testimony of each witness. There is a great variance in the testimony of the various witnesses as to the items that go to make up the total value of complainant's property. This court attaches, necessarily, much weight to the opinion of the master, with respect to the weight to be given to the testimony of the various witnesses, reserving, of course, its right to finally determine the facts. After hearing all of the evidence, the master arrived at the conclusion that the value of complainant's property used and useful as of April 1, 1933, and as

of the date of the filing of his report, which was on May 18, 1934, and for a reasonable length of time in the future, is $20,282,143. Such was the value as found by the master upon which the complainant is entitled to a reasonable return. It is the contention of the complainant that the value of its property, as shown by the evidence, and upon which it is entitled to a fair return, is approximately $28,000,000.

In arriving at his conclusion ·as to the value of complainant's property, the master took into consideration the cost of reproduction new, less depreciation method, as well as all other evidence touching upon the present value of such property. In considering the cost of reproduction new, less depreciation method, he heard testimony, gave weight to and made a finding as to the various elements which go to make up such cost, and as to the depreciation. He included in such cost the following: Organization expenses; working capital; undistributed construction costs; going value. To the total of such costs he added the value of all rights of way, etc.; also the value of all water rights and land, thus arriving at the final conclusion as to the value of such property. The engineers for the complainant and defendants agreed, prior to the hearing before the master, as to the inventory and as to the amount of land owned by the complainant. They did not agree, however, as to the value of such inventory, nor as to the value of the land. Neither did they agree as to the land that should be included in making up the total value of complainant's property which is used and useful in the furnishing of water to the city of Indianapolis and its inhabitants. It is the contention of the defendants that certain large tracts of land purchased and owned by the complainant should not be taken into consideration in determining the value of complainant's property, notably among which is the Oaklandon tract. Complaint is also made as to the Noblesville property, but in so far as this property is concerned, the master very properly included it only in the value of water rights of complainant, and gave it no other value. A different situation, however, exists as to the Oaklandon tract or project. The master found the value of this property to be $364,050. In determining that value, he found that such property consisted principally of farm land, and that it had no other or special value. He, therefore, found its value to be the same as that of other farm land in that vicinity. The only use made of this vast acreage by the complainant is that of farm land. It consists of 4,854 acres of land located along, and upon, both sides of Fall creek, beginning at a point approximately 15 miles northeast of the city of Indianapolis. The purchase of this property was approved by the defendant commission in the year 1930. It was the purpose of the complainant, at the time of the purchase, and it was so represented to the commission, to construct a dam at or near the lower boundary line of such tract and thus retard the flow of water down Fall creek. In this manner, the water would be stored up on this tract, or, in other words, it would constitute a reservoir for the storage of water to be used as needed, or in case of an emergency. It has now been more than 5 years since its purchase, and, so far as disclosed by the evidence, no effort has been made to utilize it for the purpose for which it was purchased, except the making of certain tests. No doubt is entertained as to the good faith on the part of the complainant at the time of its purchase. Reference is made by the complainant to the case of Denver Union Stock Yard Company v. United States et al. (C.C.A.10) 57 F.(2d) 735, 747, wherein it was said by the court: "The property considered to be devoted to the public use, and therefore to be valued, should include, not only that in active use in the everyday operations, but that which is properly and reasonably held in reserve to insure the sufficiency and continuity of the service."

There is no doubt as to the correctness of the rule thus announced. However, such property must be "properly and reasonably held in reserve" before it can be said that its value should be included in the total value of the property for rate-making purposes. It is not conceivable that the city of Indianapolis, and the water consumers of such city, should be required to pay the complainant a rate of return upon a large tract of land held for more than 5 years and used only for farming purposes. So far as disclosed by the evidence, this land may never be used by the complainant for the purpose of supplying water to its customers. Un-

der no consideration can it be said that this tract of almost 5,000 acres of land is used and useful in the supplying of water, and its value cannot, therefore, be included in the total value of complainant's property for rate-making purposes, when it comes to determining that value. The complainant contends that its value is much higher than that fixed by the master; its contention being that it is "properly and reasonably held in reserve," and hence has a special value higher than that of adjoining land. This contention cannot be sustained by the evidence. If the court should find the value of this land to be as contended by the complainant (approximately double that found by the master), then a still greater amount would necessarily be deducted from the total value of the property, as found by the master. The value of such land, as found by the master, is fair and reasonable, and represents the true value thereof, for the purpose for which it is used and will be used in the future. The exception of the defendants to that part of the master's report, which includes the value of the Oaklandon project in the total value of complainant's property for rate-making purposes, must be sustained.

■ There is a tract of land consisting of 99.37 acres, known as the "Mooney tract," to which the defendants object to having the value of the entire tract included. The master finds the value of this tract to be $19,874, and that it should all be included in the value of complainant's property for rate-making purposes. This land is peculiarly located along White river, being adjacent thereto, and being bounded upon the north, west, and south sides by such river. Such land is also adjacent to the canal, and it is the contention of the complainant that it is absolutely necessary for it to own the entire tract in order that it may have access to the canal. The defendants contend, however, that a strip of land 200 feet in width is sufficient, and that the value of this 200-foot strip should be the amount allowed. There may be some merit in this contention, however, the tract is suitable for farming purposes only and has no improvements thereon. If a strip of 200 feet is taken off the east side thereof, the owner is then deprived of ingress and egress, except by water or across such strip. The complainant also uses a part of this land for the storage of gravel, etc. It would seem that equity and justice require the inclusion of this entire tract in the value of complainant's property.

■ The master has determined the value of the water rights to be $358,605, to which finding the complainant has filed an exception. There can be no doubt but that valuable water rights attach to the property in question, and that the value thereof must be included in the total value of complainant's property. San Joaquin & Kings River Canal & Irrigation Company v. County of Stanislaus, in State of California, 233 U.S. 454, 34 S.Ct. 652, 58 L.Ed. 1041. The value of the water rights was considered by this court in the former rate case. The court in that hearing (1924) found the value of these rights to be $500,000. That case (McCardle et al. v. Indianapolis Water Company, supra) was appealed to the Supreme Court of the United States, and the decree of this court was affirmed. It is the contention of the complainant that the value of its water rights is now greatly in excess of that amount. The master finds that land values, which enter extensively into the valuation of the water rights, have greatly declined, and, therefore, the value of such water rights has been reduced. It is apparent that the value of the water rights is not subject to change, as is the value of other items which make up the total value of the property. The complainant has certain rights to use the water from White river and Fall creek, which rights were acquired many years ago. The fact that this court has excluded the value of the Oaklandon project from the value of the property for rate-making purposes would exclude any possible water rights because of its purchase. From a careful examination of the evidence, it is clear that the value of the water rights has not increased, and should not be reduced in proportion to the decreased value of the land. It should remain at $500,000. The exception of the complainant to the value of such rights, as found by the master, should be sustained.

The master finds that nearly $4,000,000 of the reproduction costs would be expended for common labor, such as digging trenches, laying pipes, construction of canal earthwork, levees, dams, etc. In

arriving at the sum of $4,000,000, he has considered the cost of such common labor at 30 cents per hour, which he concludes is fair and reasonable. It is the contention of the complainant that the evidence shows conclusively that the value of such services is 40 cents per hour, and that it would be necessary to pay that price in order to procure such labor. It is true that at the time of the hearing before the master, and, in fact, at the present time, there is not much demand for common labor. It is likewise true, however, that the outlook for the future, in so far as the employment of common labor is concerned, has shown indications of improvement. From an examination of the evidence, it is apparent that an allowance of 40 cents per hour for common labor is proper, and the exception of the complainant to an allowance of 30 cents per hour must be sustained.

▊▊▊ As to all other values found by the master, a study of his report discloses the fact that he did not accept the testimony or opinion of any one witness as to the value of the various items that comprise the entire property. It seems that he carefully weighed the testimony of each witness, considering the knowledge such witness had of the subject under consideration, his investigation, and opportunity to know the facts about which he testified. It is not mandatory upon the master, nor upon the court, to accept the testimony of any one witness upon any or all of the things about which he testifies. He may have a better opportunity to know the value of certain property, or be better qualified to testify as to such value, than others, and that is the fact in the instant case, as to some witnesses. The experience and training of some of the witnesses qualified them to testify as to the value of certain items which make up the aggregate of the property better than others. The master, in his report, has carefully analyzed the testimony of each witness, and his conclusion as to the value of complainant's property should stand, except as to the Oaklandon project, the water rights, and cost of common labor.

The court, therefore, finds the value of complainant's property, upon which it is entitled to a fair return, to be $21,392,821, which value is determined as follows:

| | |
|---|---|
| Value, as found by the Master | $20,282,143.00 |
| Additional values, found by the court: | |
| Water rights.............. $ 141,395.00 | |
| Common Labor.......... 1,333,333.00 | 1,474,728.00 |
| Total, as found by the Master, and additional values | 21,756,871.00 |
| Less value of Oaklandon project | 364,050.00 |
| Value, as found by the court | $21,392,821.00 |

A reasonable return upon this amount will be sufficient to meet the requirements of the Federal Constitution, and avoid confiscation.

▊▊▊ The next question to be determined is the rate of return to which complainant is entitled upon the foregoing value of its property. The master has found that a rate of return of 6 per cent. is adequate, and to this finding the complainant has filed an exception. The rate of return to which complainant is entitled must be based upon conditions as they now exist, and as it is reasonably certain they will exist in the immediate future. The rate cannot be based upon conditions as they existed in 1924, at the time of the previous rate hearing. McCardle et al. v. Indianapolis Water Company, supra. A public utility may be entitled to a certain rate of return at one time, and to an entirely different rate at another time, dependent upon conditions as they may exist at the time of the fixing of such rate. The rate so fixed must be sufficient to yield an adequate return upon the value of the property at the time fixed, and for a reasonable length of time in the future. The Supreme Court said, in the case of Bluefield Water Works & Improvement Company v. Public Service Commission of State of West Virginia et al., 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176: that a "public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties, but it has no constitutional right to profits as are realized or anticipated in highly profitable enterprises or speculative ventures." It was also said, in the same opinion, that the return "should be reasonably sufficient to assure confidence

in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." The above language was quoted, with approval, in the recent case of Los Angeles Gas & Electric Corporation v. Railroad Commission of California et al., supra. See, also, Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255. These are the principles which must be considered and applied in arriving at the conclusion as to a reasonable rate of return. There was testimony presented to the master by bankers and officials of other water works companies to the effect that it requires 8 per cent. to yield an adequate return. There was also testimony from others, ex-bankers, investment brokers, and utility experts, to the effect that a return of 6 per cent. is sufficient. One witness even placed the return at a figure between 5 and 6 per cent. There can be no doubt that the market condition and the money question should enter into the solution of this problem. The complainant corporation is being operated upon a sound basis, and there is no ground for serious criticism as to its economical operation. It is a matter of common knowledge that the matter of investments in securities is abnormal, and has been for some time, and may so extend into the distant future. The market for bonds and securities is also abnormal. It is quite a problem to find a safe investment at a rate of return much less than 6 per cent. The rate of return upon government and municipal bonds is much less than 6 per cent. Interest paid by banks upon deposits and savings accounts is less than 3 per cent. The return upon loans secured by mortgage upon real estate yields less than 6 per cent. ordinarily, and there is a certain risk attached to such loan that does not attach to a utility investment. The investment of complainant is protected by law, and a reasonable return upon it is assured. That fact alone makes its securities desirable. This court, early in the year 1929, in the case of Greencastle Water Works

Company v. Public Service Commission of Indiana et al., 31 F.(2d) 600, held that a rate of return of 6½ per cent. was adequate, and no appeal was taken from that decision. The conditions of the money market, and the opportunity for investment, were much better at that time than they are at the present time. A return of 6 per cent. upon the value of complainant's property in the instant case is sufficient to yield a fair and reasonable return upon the value of its property, as heretofore found by the court.

The remaining question to be determined is whether or not the revenue to be derived from the schedule of rates in question is sufficient to assure a 6 per cent. return upon the value of complainant's property, to wit, $21,392,821. The master arrives at the conclusion that the income applicable to return for the year 1933 and for a reasonable time thereafter, based upon the schedule of rates which became effective January 1, 1933, will be $1,294,566.51. This income is sufficient to assure a return of slightly in excess of 6 per cent. upon the value of complainant's property, as heretofore found. It may be observed that if the figures of the master, as to complainant's income, are not substantially correct, the complainant, according to the master's report, was given an opportunity, before the filing of such report, to present its books and to furnish the master with the exact figures as shown by such books as to the income and operating expenses for the year 1933, under the schedule of rates in question. This information was not furnished the master. Furthermore, almost a year and a half has elapsed since the filing of the master's report, and no request has been made by the complainant to supply any additional evidence upon that subject. Therefore, it is logical to conclude that the master's deductions and computations are accurate and should be accepted by the court.

The schedule of rates in issue will provide a sufficient income to constitute a fair and reasonable return upon the value of complainant's property as heretofore found, and is hence not confiscatory. The exceptions, therefore, of both the complainant and defendants, except as heretofore sustained, are overruled, the

master's report approved, except as heretofore stated, and the bill of complaint will be dismissed for want of equity at the costs of complainant.

A decree will be prepared accordingly.